## SULLIVAN and others *v.* ANDOE and others.

*(Circuit Court, D. Maryland.   April 5, 1881.)*

1. DECEDENT'S ESTATE—DISTRIBUTION—FRAUD.

    A bill in equity was filed by certain aliens, residing in Ireland, claiming to be the next of kin of an intestate who had died in St. Louis, seeking to set aside a distribution of his personal estate made by his administrators under orders of the probate court of St. Louis.   The proof showed that the distribution was procured by fraud, and that the persons to whom the estate had been distributed were not the intestate's next of kin, and that the complainants were.

    *Held*, that the distribution of the probate court having been procured by fraud, should be set aside and the fund brought into this court.

2. LUNATIC—PROCESS—SERVICE ON COMMITTEE.

    The only one of the persons to whom the estate had been distributed, found within the district, was a lunatic, to whose committee one-fourth of the estate had been paid.   She had been returned summoned by service on her committee, and he had appeared and fully answered, and on her behalf, with the assistance of able counsel, had resisted the claims of the complainants.   After taking testimony in Ireland and several of the United States for over two years, the case came on for final hearing.   The lunatic had been for about 30 years in an insane asylum in the district, and had been found *non compos* by a jury, and so adjudged by a competent state court, which appointed her committee.

    *Held*, under the circumstances, that service of the subpœna on the lunatic by service on the committee was sufficient, and that the answer of the committee should be taken and treated as the answer of the lunatic.

3. LACHES.

    *Held*, under the facts of the case, that the complainants had not lost their right to relief by delay.

4. DECEDENT'S ESTATE—ADMINISTRATION—PARTIES TO PROCEEDINGS.

    *Held*, that the children of a brother of the intestate, who died after the intestate, could sue as complainants, and that administration could be taken, after the fund sought to be recovered was brought into court.

5. LUNATIC—FUND IN HANDS OF COMMITTEE—JURISDICTION.

    *Held*, that the fund in the hands of the committee was not in the custody and possession of the court which appointed him in such sense that no other court could adjudicate with regard to the title to it.

In Equity.   Before BOND and MORRIS, JJ.

v.6,no.7—41

*Willoughby N. Smith, Robert G. Keene, John Henry Keene, Jr.,* and *Archibald Stirling, Jr.,* for complainants.

*J. T. Mason, R.,* and *S. T. Wallis,* for defendants.

MORRIS, D. J. This is a bill in equity filed by certain aliens, residing in Ireland, claiming to be the next of kin of Edward Sullivan, deceased, late of the city of St. Louis, in the state of Missouri, and entitled to his personal estate, charging that the sums of money obtained by certain of the defendants in a distribution of his personal estate heretofore made by the probate court for the city of St. Louis were obtained by fraud practiced upon that court, and praying for a decree setting aside that distribution and compelling the defendants to bring into this court the money received by them, to the end that the complainants may receive what they claim belongs to them.

It appears that in 1866 Edward Sullivan died in St. Louis, unmarried and intestate. He was found dead in his room, and the coroner was about to have his body interred at the public expense, when it was discovered, through John Maquire, an agent who had been employed by him in the management of his property, that he was a person of considerable fortune. Maguire was subsequently appointed, by the probate court of St. Louis, his administrator, settled his debts and funeral expenses, and distributed the residue of his personal estate under orders of that court.

To procure that distribution, a certain Henry Murta, (now dead,) then residing in the state of Pennsylvania, filed in said probate court his affidavit, dated January 30, 1869, in which he swore that he was a second cousin of the deceased; that the intestate had come to this country from Ireland, and never had a brother, and had had but one sister, who had died in Ireland, at the age of 45 years, unmarried; that the father, mother, grandfather and grandmother, uncles and aunts of the intestate had long been deed; that the only one of his uncles or aunts who had left descendants was an uncle named Matthew Andoe; that the only child of this Matthew Andoe living at the death of the intestate was a certain Rosanna Andoe, a lunatic, then about 65 years of

age, and an inmate of Mount Hope insane asylum, near the city of Baltimore, in the state of Maryland; that said lunatic had had a sister, Ann Andoe, who had married, in Ireland, a certain John Murta; and that he, the affiant, (Henry Murta,) was their son; that there had been other children of said marriage besides himself, but that none of them were ever married, and all but himself were dead at the date of the death of the intestate, except, perhaps, a brother of the affiant, named Matthew Murta, who went to Australia in poor health, in 1858, and who had not been heard from since 1858, when he had written to affiant, at Pittsburgh, that he was going from Australia to South America on account of his ill health, where affiant believed he had died; that affiant had had a cousin named Eliza Murta, who was last heard from in 1858, when she left Darlington, in the state of Pennsylvania, and had not since been heard from; that said Rosanna Andoe (the lunatic) and himself (the affiant) were the only living persons entitled to share in the distribution of the intestate's estate, unless the said Matthew Murta and Eliza Murta were living.

Two other affidavits only were filed. One James Creamer, who had known Henry Murta and his family in Ireland, made affidavit that he, the affiant, had come to this country about 19 years before, and that he believed that Henry Murta was the only living child of his parents, and that there were no descendants of any other, and that he had never heard of any relatives of the intestate except Rosanna Andoe and the said Henry Murta. One David D. Lynch made affidavit that he knew the Murta family in his boyhood in Ireland; that from what he knew he believed Henry Murta's parents were dead, and all his brothers and sisters had died without living descendants, and that said Henry Murta and the said Rosanna Andoe were the only living relatives of the intestate.

Upon these three affidavits, presented to the court by counsel, representing Henry Murta and Rosanna Andoe, a partial distribution of the personal estate was made by the administrator on February 6, 1869, under order of the court, and

$3,000 was paid to the committee of Rosanna Andoe and the like sum to Henry Murta.

Shortly after this it appears that the widow of Edward Murta, a brother of the above-named affiant Henry Murta, saw in a newspaper some mention of this distribution, and she immediately caused affidavits of numerous witnesses to be filed in said probate court, establishing the fact that her husband, who had died in 1865, was a brother of Henry Murta; that she had been married to him in Pittsburgh in 1850, and that they had lived there continuously, and had four children who were living.

It appeared from the affidavits that Henry Murta, whose residence had been in Pittsburgh and St. Louis, and who, in his affidavit, had failed to mention this brother or his children, had from time to time lived in the same house with them in Pittsburgh, and a physician made affidavit that in December, 1859, he had attended Henry Murta during an illness at Edward Murta's house. Upon the showing made by these affidavits the children of Edward Murta were admitted without opposition to share in the estate, and a further distribution was made of $4,000 each to Henry Murta and the committee of Rosanna Andoe, and $1,750 to each of the four children of Edward Murta. These sums were paid by the administrator under an order of the court, dated fourteenth of June, 1869. On the twenty-seventh of September, 1869, there was a final settlement by the administrator, in which the committee of Rosanna Andoe received the further sum of $5,069.65.

The present suit was instituted in January, 1879, by Emily Sullivan, claiming to be a sister of the intestate, and by the son and daughter of John Sullivan, deceased, alleged to have been a brother of the intestate. These complainants claim that they are the persons and the only persons who, as his next of kin, had any right to the intestate's personal estate. The defendants in this suit are Rosanna Andoe, the lunatic; John T. Mason, R., her present committee; Elder, a former committee; Merryman, administrator of Scott, a deceased committee; the executor of Henry Murta, who is now

dead; the four children of Edward Murta, and their guardian; and Maguire, the administrator of Edward Sullivan. The only defendants who have been summoned are Rosanna Andoe and Mason, her present committee; Elder, her former committee; and Merryman, the administrator of the deceased committee. The other defendants are now residents of this district, and have not been summoned, nor have they appeared or answered.

The proof which the complainants have produced convincingly establishes the relationship claimed by them to the intestate, Edward Sullivan. The family history of the intestate, and of his five brothers and one sister, is clearly proved by the testimony of numerous witnesses examined under a commission sent to Ireland, and they are corroborated in many essentials by the production of a copy of the will of the mother of the intestate, dated in 1838, in which the intestate is mentioned by name, and described as residing in Pittsburgh, in America, and the testator's nephew, John Andoe, is also mentioned as residing at Pittsburgh. Special provision is made for the support of the testator's only daughter, the complainant Emily Sullivan, who was then and now is both deaf and dumb; and the other sons of the testatrix, brothers of the intestate, are also mentioned.

It also clearly appears, we think, from the proof, that Henry Murta, in the affidavit he made on the thirtieth of January, 1869, to procure the distribution ordered by the probate court of St. Louis, was guilty of many false statements and suppressions of the truth. It was not true, to begin with, that Matthew Andoe, his maternal grandfather, through whom he traced his relationship to the intestate, was the intestate's uncle, as he alleged. It was true, however, that his maternal grandmother was an aunt of the intestate. It was not true that his own mother, through whom he traced his kinship, was dead. She was then living in Ireland, and did not die until 1874, and letters had been received by her from him in 1866. The account he gave of the death of his own brothers and sisters was not true. Several of them were then living in Ireland, and also quite a number of his cousins, who

were as nearly related to the intestate as himself. He had himself been to Ireland on a visit in 1851 or 1852, and quite a number of the witnesses examined under the Irish commission say they then saw and talked with him. These were persons familiar with the family history of the intestate, and of the complainants' relationship to him. It appears further that he could not possibly have been ignorant of the existence of the children of his brother Edward, who were all living in Pittsburgh; and upon them coming forward and making claim, their rights were at once recognized without opposition from him. The falsity of his affidavit with regard to his own immediate family and relatives, swearing as he did to the death or non-existence of persons he well knew, and had no reason to suppose to be dead, lead to the conclusion, when considered in connection with his opportunities of knowledge, that when he undertook to swear that the intestate never had had a brother, and never had but one sister, and that she had died unmarried, he either swore to matters of which he had no knowledge or information whatever, or, as seems more probable, he was suppressing information which he had or could easily have obtained, and that he did so to deceive the probate court and procure the distribution in his favor.

The fact that Edward Sullivan, the intestate, was living at Pittsburgh, in America, and that he was a wealthy man, was known to persons with whom the affiant talked during his visit to Ireland in 1851 or 1852, and they knew that he came from the same city in the United States in which the intestate resided, and they knew of the existence of the complainants, and of their relationship to the intestate, and it is highly improbable that he could, after talking with them, have remained ignorant of the existence of the complainants. Another circumstance which throws light on his attitude towards this large estate, and his want of confidence in his claim to share in it, is the fact that it appears that he had made a contract with the attorneys who represented him in the distribution by which they were to receive one-half of all they obtained for him.

We are satisfied that the complainants have established their kinship to the intestate, and their right to be recognized as entitled to his personal estate, and that the persons to whom it was distributed had no right whatever to it, and that the distribution made was procured by fraud practiced upon the probate court by Henry Murta, one of the distributees.

Finding the equity of the case to be with the complainants, it remains to examine the objections of a technical character to granting them relief which have been ably urged by counsel who have appeared on behalf of the committee of the lunatic and zealously represented her rights. The jurisdiction of this court, sitting in equity, to grant relief in cases where there has been fraud in obtaining judgments or decrees in other courts, where the fraud is clearly proved, is not seriously questioned, and we take it to be fully established. *Gould* v. *Gould,* 3 Story, 516; Story's Equity, 252*a.*

The committee of the lunatic was represented in the distribution by the same counsel who represented Henry Murta, and her claim rested entirely on the affidavits hereinbefore mentioned, which were filed on his behalf; so that, although her committee, and of course she herself, were in one sense innocent of participation in misleading the probate court, they reaped the fruits of Henry Murta's conduct, and have no better title to the money distributed to her than he had to the sums which he obtained.

The points principally relied upon by counsel for the committee are as follows:

*First.* It is objected that Rosanna Andoe, the lunatic, has not been summoned. Process was prayed against her, and also against her duly-appointed committee, who is at present acting for her. The subpœna against her was returned served by service on her committee. Her committee, although not answering in her name, has answered fully in his character of committee, and has presented every defence which he could have presented if answering in her name, and he has stubbornly resisted the pretensions of the complainants, and has been assisted by able counsel in defending his rights.

This he has done under the sanction of the state court which appointed him, and the expense has been by order of that court paid out of the lunatic's estate. The lunatic herself is and has been for some 30 years an inmate of an insane asylum in this district, and service of process on her personally would have availed nothing. It would have been more regular to have applied to this court to appoint some one to answer and defend the suit for her, in accordance with the eighty-seventh equity rule; but, unquestionably in this case, the court would have appointed her present committee, and the very same answer would have been filed. If there was any reason to suspect that the committee who has defended her interest had not done his whole duty, or had any interest opposed to hers, the court would not be slow to require a separate answer to be filed on her behalf by some one specially appointed to defend her; but to do so in this case would be to do an utterly nugatory act in a case in which the point is now for the first time raised on final hearing, after taking testimony on both sides for two years at great expense.

It seems to us proper in this case that the answer filed by her committee should be treated and taken as the answer of the lunatic.

*Second.* It is urged that the complainants are barred of their relief by limitations, lapse of time, laches, and delay in filing their bill. What will constitute such a bar as to a claim purely equitable must depend upon the facts and circumstances of each case. 1 Story's Equity, 64*a*; *Hanson* v. *Worthington*, 12 Md. 441; *Syester* v. *Brewer*, 27 Md. 319; *Etting* v. *Marx*, 4 FED. REP. 673.

It is to be noticed that the complainants are aliens residing in Ireland; that one of them is a person deaf and dumb from her youth. So far as we can gather from the record it does not appear that any notice was published, pending the administration in the probate court, warning the next of kin of the intestate to appear as claimants of the estate. They first obtained knowledge of the death of the intestate in 1874. In 1876 they filed a bill in one of the courts of St. Louis to

set aside the distribution for fraud. None of the parties who had received distributive shares of the estate resided in the state of Missouri, and they could not be served with process, and it was found that the administrator was protected by the order of the probate court. The complainants then dismissed that bill, and finding in this district the lunatic and the money distributed to her, they filed this bill in January, 1879. Considering the difficulties in the way of the complainants, and that the defendant has been in no way prejudiced by the lapse of time, we do not see any reason why, in a case in which the equities are so plain, the defence of laches should prevail.

*Third.* It is urged that the proper parties have not been made complainants. It is objected that even if it is admitted that the complainants have established their relationship, and that the complainant Emily Sullivan is a sister of the intestate, and that the complainant Mary Mowlds and her brother, Jeremiah Sullivan, are children of John Sullivan, a deceased brother, yet as the testimony shows that John Sullivan died in London in 1867, after the death of the intestate, the administrator of John Sullivan should be the complainant claiming his interest and not his children. Conceding it to be true that the administrator is the proper party to receive the distributive share of John Sullivan, we still have one of the complainants with an undoubted standing in court, and as, until the decision of this suit, it could not be known whether or not there would be assets of John Sullivan, in Maryland, requiring administration, and as the administration would have to be taken out in Maryland, we think the persons presumably, equitably, and beneficially entitled to his estate may, with the other complainant, in a suit of this character, be allowed to represent his interest in the fund sought to be recovered. There can be no difficulty in now requiring administration on the estate of John Sullivan, and in allowing his Maryland administrator, or indeed any other parties who might prove themselves entitled to any distributive share of the fund to be recovered, from coming in and sharing in the benefit of any decree.

*Fourth.* Another defence set up is that the fund sought to be affected by a decree in this case is in the possession and control of the circuit court of Baltimore city, which appointed the ·committee of the lunatic, and that, therefore, every other court is excluded from adjudicating any question. with regard to it. Rosanna Andoe was found in 1869 to be of unsound mind, under a writ *de lunatico inquirendo*, issued by the circuit court of Baltimore city, and, upon the ratification of the return of the writ, that court, exercising equity jurisdiction, appointed two persons committee of her person and estate. The fund now sought to be reached was paid to them by the administrator of Edward Sullivan, the intestate, and has been invested and held ever since, first by the committee so appointed, and subsequently by the present committee, who succeeded them in that office. Whatever that court as a court of equity, upon a proper bill filed therein, or any other court of equity, could decree with respect to the ownership of that fund, this court, having all the equity jurisdiction that appertains to any court, can in like manner decree. *Payne* v. *Hook*, 7 Wall. 430. The complainants might have filed their bill for relief in the court which appointed the committee, but they were under no obligation to do so, because, being aliens, the constitution and laws of the United States have given them the right to choose the federal court.

We do not think the proposition can be maintained that property held by a committee of a lunatic is to be considered in the custody and possession of the court which appointed him, and to which he is accountable for its management, in such sense that no other court can adjudicate with regard to the title to it, or any trust to which it may be subject. The unjust results of such a doctrine are obvious and at once suggest themselves. The power to appoint such a committee might, by the legislature, be conferred upon any court of the state, and should the committee so appointed obtain possession, by color of his office, of any property, real or personal, no matter to whom belonging, the true owner could not recover it except by petition to that court; and, no matter how deficient that court might be in jurisdiction or machinery to

try the question of title, it could not be tried elsewhere except by the allowance and permission of that court. The lunatic and her committee are both parties to this case; the committee has defended it on her behalf, with the sanction of the state court which appointed him, and they are both bound by any decree passed herein, and we think the fruits of that decree should be realized without special difficulty.

In our judgment the complainants have shown themselves to be entitled to the relief prayed for, and we will sign a decree in proper form establishing their rights, and directing that the fund affected by the decree be brought into this court for the benefit of the parties entitled to it.